CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 16 2014

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| KRISTIE ST. CLAIR REED, ) | |
| ) | Civil Action No. 7:13-CV-00543 |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| ) | By: Hon. Glen E. Conrad |
| DEPARTMENT OF CORRECTIONS / ) | Chief United States District Judge |
| COMMONWEALTH OF VIRGINIA, ) | |
| ) | |
| Defendant. ) | |

Plaintiff Kristie St. Clair Reed, a former senior correctional officer at Bland Correctional Center ("BCC") in Bland, Virginia, filed this lawsuit against Defendant Virginia Department of Corrections ("VDOC"), alleging that she was sexually harassed at BCC and then terminated for reporting this harassment. The case is presently before the court on VDOC's motion for summary judgment. For the following reasons, that motion will be granted in part and denied in part.

### Factual and Procedural History

The following facts from the summary judgment record are either undisputed, or, where disputed, are presented in the light most favorable to Reed. See Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986) (stating that all evidence must be construed in the light most favorable to the party opposing summary judgment).

Reed began working for VDOC in 2007. In October 2009, Reed was transferred to BCC, where she was employed until her termination on May 18, 2012. Reed claims that Sergeant J.W. Mitchell began sexually harassing her in February 2010, when he was first

assigned to her shift at BCC. Mitchell repeatedly asked Reed out on dates, followed her around the yard, and slammed doors and yelled at her when she refused his advances or spoke to other male officers. Mitchell also "told [Reed] that [she] needed to watch [herself] and if [she] didn't do what he wanted that he would fix [her] performance review and give [her] a bad review." Reed Dep. 101:20-24; 102:1, Pl.'s Br. in Opp. Ex. 9, ECF 21-9. Reed reported Mitchell's behavior up her "chain of command" to Sergeant John Nunley. Reed Dep. 104:15-17. Shortly thereafter, Mitchell was transferred to a different shift and had no further contact with Reed. Reed did not file a formal sexual harassment complaint or otherwise notify BCC administration of her concerns at this time.

In February 2012, Mitchell was again assigned to the same shift as Reed. At that time, Reed's duties included supervising the top floor of BCC Building #1 ("One-Top"), which required "constant surveillance, security and control of all activities and persons within the dormitory and living areas." BCC Security Post Order, Def.'s Mot. Summ. J. Ex. A, ECF 16-3. While on duty, correctional officers could only leave their posts with permission from a supervising officer and could only use the office telephone and radio for official business. Id.

On April 7, 2012, Reed found herself ill while working on One-Top. She called Correctional Officer Charles Taylor on the One-Top office phone to seek his advice regarding how to handle her illness, placing the telephone off the hook when she went to a nearby bathroom to vomit. Captain Larry Shelton saw Reed talking on the telephone during his rounds that evening. At that time, Reed asked Shelton if she could leave early. Shelton asked her to wait until the shift's midnight break, and Reed agreed. Later, Shelton took Reed aside to discuss her "alertness on post." Mitchell, who was supervising One-Top that evening, was

also present in this meeting as a "witness." Shelton Dep. 33:17-19, Pl.'s Br. in Opp. Ex. 10, ECF 21-10. After this meeting, Reed ultimately worked her entire shift.

Shelton later reviewed BCC phone records, which showed three calls placed during Reed's shift, ranging in length from 2 minutes to 27.8 minutes. Shelton also reviewed BCC cameras, which showed Reed sitting in the One-Top office chair from 6:22 p.m. until 7:02 p.m., instead of patrolling the One-Top dormitories as her job duties required. As a result, Shelton formally reported Reed for "not...performing her job function as a corrections officer." Shelton Dep. 28:1-3. In his disciplinary report, Shelton noted that Reed "sounded as though [she] was throwing up sick" when he first confronted her for being off-post, and that "Officer Parris said that he felt sorry for Officer Reed because she was sick." Incident Report, Pl.'s Br. in Opp. Ex. C, ECF 21-3. However, Shelton also noted that Mitchell had told him that "Officer Reed and Officer CL Taylor [were] having a relationship and that [Mitchell] bets that she was on the phone with Officer Taylor." Id.

The next day, April 8, 2012, Reed met with then-Lieutenant Dallas Bradshaw regarding this incident. Reed expressed concern about being disciplined, stating that she felt Shelton was "picking on her" because "Mitchell was mad at her." Bradshaw Dep. 7:8-15, Pl.'s Br. in Opp. Ex. 4, ECF 21-4. Reed also told Bradshaw about the 2010 harassment at this time. Bradshaw spoke to Mitchell about Reed's allegations, which he denied. Bradshaw then summoned Reed to speak directly with Mitchell regarding her allegations, which resulted in a shouting match between Mitchell and Reed. Bradshaw eventually sent Mitchell and Reed home "and told them not to come back to work until they had heard from [human resources]." Id. at 9:6-8. Bradshaw testified that meeting with Mitchell and Reed together that day violated VDOC policies regarding sexual harassment. Id. at 8:10-13.

The following day, April 9, 2012, Reed filed an Internal Incident Report regarding Mitchell. In that report, Reed stated that in 2010, Mitchell was "overly friendly" and told her to "keep in mind" that he completed her reviews. See Internal Incident Report, Def. Mot. Summ. J. Ex. E, ECF 16-3. Reed stated that she reported Mitchell's behavior to Nunley, and that after she did so, "it was over and done with [and] Mitchell apologized." Id. She then stated that in 2012, "things started out fine, then [Mitchell] started being overly friendly [and] rubbed my leg in the seating area in…the warden's office" on April 7, 2012. Id. She also stated that Mitchell questioned Reed about her personal relationship with Officer Taylor that day.

After Reed filed this report, BCC Warden Larry Jarvis immediately moved Mitchell to a different shift and placed both Mitchell and Reed on administrative leave pending investigation of Reed's allegations. Robin Snavely, BCC's Employment Relations Manager, conducted an investigation pursuant to VDOC's written sexual harassment policy. See Snavely Decl. ¶ 2, Def.'s Mot. Summ. J. Ex. 2, ECF 16-2. During this investigation, Snavely interviewed Reed and Mitchell, as well as Officer Taylor, Officer Clemons, Officer Puckett, Sergeant Nunley, and Lieutenant Bradshaw. None of the persons interviewed by Snavely confirmed Reed's allegations. As a result, Snavely submitted a report to Warden Jarvis concluding that "[t]he allegations of sexual harassment and workplace harassment cannot be substantiated" on April 13, 2012. Administrative Investigation Report, Def.'s Mot. Summ. J. Ex. I, ECF 16-4. Jarvis wrote to Reed on April 20, 2012 and Mitchell on April 23, 2012, advising them of the results of this investigation. See Jarvis Letters, Def.'s Mot. Summ. J. Ex. J and K, ECF 16-4.

On May 18, 2012, Jarvis issued a Written Notice terminating Reed's employment as a result of her off-post behavior on April 7. The notice reflected that Reed had two other active disciplinary infractions on her record at the time of her termination. See Written Notice of Termination, Def. Mot. Summ. J. Ex. L, ECF 16-5. Reed filed a Charge of Discrimination with the Equal Employment Opportunity Commission on August 13, 2010. She received a Dismissal and Notice of Rights from the EEOC on August 19, 2013.

Reed commenced this action on November 15, 2013. In her complaint, Reed alleges that her sexual harassment and subsequent termination violate Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Specifically, Reed asserts claims for a hostile work environment, quid pro quo discrimination, sex discrimination, and retaliatory discharge. On August 11, 2014, VDOC filed a motion for summary judgment. The court held a hearing on the motion on September 8, 2014, and the motion is now ripe for review.

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in her favor. Id. at 255; see also Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

Reed filed suit under Title VII, which prohibits practices that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's...sex...." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits discrimination with respect to employment decisions having a direct economic impact, like terminations or demotions, as well as actions that create or perpetuate a hostile or abusive working environment. See Vance v. Ball State Univ., ___ U.S. ___, 133 S. Ct. 2434, 2440 (2013). In moving for summary judgment, VDOC contends that Reed has failed to demonstrate a genuine issue of any material fact with regard to each of her Title VII claims. The court will address each claim in turn.

## I. *Hostile Work Environment*

Reed claims that Mitchell's harassment created a hostile work environment. To recover under Title VII for a hostile work environment created by sexual harassment, a plaintiff "must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer."[1] Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003). "Under Title VII, an employer's liability...may depend on the status of the harasser." Vance, 133 S. Ct. at 2439. If the harasser is the victim's co-worker, the employer is liable "only if it was negligent in controlling working conditions." Id. On the other hand, if the harasser was the victim's supervisor, the employer is strictly liable if

---

[1] Whether the offending conduct was unwelcome is a subjective analysis, but the remaining factors are weighed objectively, considering the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Because the court's decision here turns on whether Mitchell's harassment can be imputed to VDOC, the court does not consider whether the harassment was sufficiently severe or pervasive to make out a hostile work environment claim.

the harassment results in a tangible employment action.[2] Id.

In Vance, the Supreme Court defined a "supervisor" as one who "is empowered by the employer to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. at 2443 (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). The Vance Court specifically rejected the more "nebulous" definition of supervisor formerly promoted by the EEOC and adopted by the Fourth Circuit, which tied "supervisor status to the ability to exercise significant direction over another's daily work." Id. The Court emphasized that by creating a "clear distinction" between supervisors and co-workers, "supervisory status [can] be readily determined, generally by written documentation." Id. Thus, whether a victim's harasser qualifies as her supervisor "will generally be capable of resolution at summary judgment." Id. at 2443, 2449.

The court concludes that Mitchell does not qualify as Reed's supervisor under Vance, because he lacked the authority to take any tangible employment action against her. Mitchell did not have the authority to alter Reed's schedule, discipline her, choose not to promote her, or fire her.[3] In fact, Mitchell could only complete a performance evaluation for Reed if her Shift Lieutenant randomly selected him to do so. See Shelton Dep. 10:6-11 (stating that the shift lieutenant "just randomly select[s]…who he wants to be the evaluating supervisor for that officer" based on the number of officers assigned to each shift). Mitchell's responsibilities do

---

[2] If no tangible employment action takes place, "the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Id. This affirmative defense is inapplicable here, as Reed's termination clearly constitutes a tangible employment action.

[3] The record shows that Warden Jarvis had the sole authority to formally discipline and terminate Reed. See Jarvis Dep. 9:10-22.

7

Case 7:13-cv-00543-GEC   Document 35   Filed 09/16/14   Page 7 of 15   Pageid#: 784

include "day to day supervision of staff." Work Description, Def.'s Mot. Summ. J. Ex. P, ECF 16-5. However, "[t]he ability to direct another employee's tasks is simply not sufficient" to create a supervisory relationship. Vance, 133 S. Ct. at 2448; see also id. at 2444-46 (noting that the term "supervise" has varying colloquial meanings and thus cannot control a court's determination of supervisor status). Because Mitchell does not qualify as Reed's supervisor, VDOC cannot be held vicariously liable for any hostile work environment that may have been created by his harassment. See, e.g., McKinnish v. Donahue, 2014 U.S. Dist. LEXIS 113617, at *14 (W.D.N.C. Aug. 15, 2014).

Reed's claim for hostile work environment can therefore survive only if she can produce evidence showing that VDOC was negligent in controlling working conditions at BCC. See Vance, 133 S. Ct. at 2439. To do so, Reed must demonstrate that VDOC "knew or should have known about the harassment and failed to take effective action to stop it." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 334 (4th Cir. 2003); see also Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999) ("[E]mployers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop [the harassment]."). An employer can be charged with "constructive knowledge of co-worker harassment when it fails to provide reasonable procedures for victims to register complaints." Ocheltree, 335 F.3d at 334. However, "an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir. 2001).

Here, Reed first took advantage of VDOC's formal harassment reporting procedures on April 9, 2012. VDOC took action to stop the harassment as soon as Reed filed her complaint. Jarvis immediately placed Mitchell and Reed on leave, and Snavely completed a formal

investigation of Reed's allegations within a week of her complaint. See Harris v. L&L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997) (citing Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996)) ("A good faith investigation of alleged harassment may satisfy the 'prompt and adequate' response standard, even if the investigation turns up no evidence of harassment."). The record suggests that the sexual harassment investigation proceeded independently from any disciplinary investigation. See Snavely Aff., Def. Mot. Summ. J., ECF 16-2. No evidence suggests that "the investigation was a sham or that it was not intended to uncover the truth concerning the allegations of sexual harassment." McKinnish, 2014 U.S. Dist. LEXIS 113617, at *15 (citing Jordan v. Donahoe, 2013 U.S. Dist. LEXIS 105058 (E.D.Va. July 26, 2013), aff'd 549 Fed. App'x 213 (4th Cir. 2014)). Because Reed has failed to present any evidence showing that VDOC was negligent in controlling the working conditions at BCC, her hostile work environment claim fails as a matter of law and will be dismissed.

## II. *Quid Pro Quo Discrimination*

Reed also claims that Mitchell's threat to "fix" her performance review if she refused his romantic overtures amounts to quid pro quo sexual discrimination. Quid pro quo discrimination occurs when an employee's continued enjoyment of job benefits, including employment, is conditioned upon acquiescence to a supervisor's sexual advances or harassment. See Katz v. Dole, 709 F.2d 251, 254 (4th Cir. 1983). "To establish a prima facie case of quid pro quo sexual harassment under Title VII, a plaintiff must establish [that] (1) she belongs to a protected group; (2) she was subject to unwelcome sexual advances; (3) the unwelcome conduct was because of sex; (4) her reaction to the harassment affected tangible aspects of her employment; and (5) there are grounds for holding the employer liable for the

9

Case 7:13-cv-00543-GEC Document 35 Filed 09/16/14 Page 9 of 15 Pageid#: 786

employee harasser's conduct." Briggs v. Waters, 455 F. Supp. 2d 508, 518 (E.D. Va. 2006) (internal citations and quotations omitted).

Reed's quid pro quo claim fails for the same reason as her hostile work environment claim: Mitchell was not her supervisor, because he could not take any tangible employment actions against her. See McKinnish, 2014 U.S. Dist. LEXIS 113617, at *17 (calling supervisory status "an essential element of a quid pro quo claim" after Vance). Thus, even if Reed could make out a viable quid pro quo claim against Mitchell, VDOC cannot be held vicariously liable for that conduct. See Hague v. Univ. of Texas Health Science Center, No. 13-50102, 560 F. App'x. 328, 331-32 (5th Cir. 2014) (unpublished) (holding that the standards for determining who is a supervisor under Vance apply to quid pro quo cases as well as hostile work environment claims). As discussed above, the record also lacks any evidence suggesting that VDOC was negligent in controlling the working conditions at BCC. Thus, Reed's quid pro quo claim fails as a matter of law and will be dismissed.

### III. *Sex Discrimination*

Reed also asserts that her termination constitutes sex discrimination in violation of Title VII. To demonstrate a prima facie case of sex discrimination, a plaintiff must initially show either (1) direct evidence of intentional discrimination,[4] or (2) circumstantial evidence of discrimination under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973). Under the McDonnell Douglas framework, a plaintiff must initially "show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the

---

[4] Reed does not offer any direct evidence of intentional discrimination.

position remained open or was filled by similarly qualified applicants outside the protected class." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc).

If a prima facie case is presented, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. If the employer meets this burden of production, then "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)). The ultimate burden of persuasion remains with the plaintiff throughout. Id.

Reed has satisfied her initial burden here. Reed is a member of a protected class, and she suffered an adverse employment action when she was terminated in May 2012. Although VDOC contends that Reed failed to satisfy its expectations when she was inattentive to her duties on April 7, 2012, Reed has provided evidence suggesting that this expectation may not be legitimate. See Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 517 (4th Cir. 2006) (stating that "[a]lthough on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering …with evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all."). For example, the record shows that a correctional officer would not violate BCC policy if she left her post because she was sick. See Jarvis Dep. 34:20-24, 35:1-5. The record also suggests that BCC correctional officers regularly sat in the One-Top office for extended periods and used the office telephone for personal calls with the knowledge and consent of their supervisors. See Frazier Decl. ¶¶ 5-9, Pl.'s Br. in Opp. Ex. 1, ECF 21-1.

11
Case 7:13-cv-00543-GEC    Document 35    Filed 09/16/14    Page 11 of 15    Pageid#: 788

Viewing the evidence in the light most favorable to Reed, the court cannot conclude that she failed to meet VDOC's legitimate expectations as a matter of law.

Thus, the burden shifts to VDOC to present a legitimate, nondiscriminatory reason for terminating Reed. "The employer's burden at this stage is one of production, not persuasion; it can involve no credibility assessment." Warsh, 435 F.3d at 514. According to VDOC, Reed was terminated for her failure to remain alert on post on April 7, 2012, a violation of BCC's written policies. "[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410-11 (7th Cir. 1997)). The court finds that VDOC's proffered explanation for Reed's termination satisfies its burden of production here, even if that explanation is not ultimately found credible.

The burden therefore shifts back to Reed, who must provide evidence that VDOC's proffered reason for her termination is actually pretext for discrimination. "[I]t is the perception of the decision-maker which is relevant" when considering evidence of pretext. Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000). In this case, Reed has produced testimony by Jarvis, VDOC's decision-maker, that an ill correctional officer would not be disciplined, much less terminated, for leaving her post to vomit. See Jarvis Dep. 34:20-24, 35:1-5. In turn, Shelton's report noted that Reed may have been ill during the events giving rise to her disciplinary infraction. See Incident Report (stating that Reed "sounded as though [she] was throwing up sick"). The record also contains evidence suggesting that other

correctional officers were not disciplined for similar conduct, and that lackadaisical behavior was condoned by BCC administration. See Frazier Decl. ¶¶ 5-9.

The court finds that Reed has produced sufficient evidence to create a question of fact with respect to whether VDOC's justifications for her termination were pretextual, precluding summary judgment on Reed's sex discrimination claim.

## IV. *Retaliatory Discharge*

Reed also contends that VDOC unlawfully terminated her for reporting her sexual harassment. In addition to prohibiting discrimination on the basis of a protected trait, Title VII makes it unlawful for an employer to retaliate against an employee "because [the employee] has opposed any practice made unlawful by [Title VII]." 42 U.S.C. § 2000e-3(a). Where there is no direct evidence of retaliation, the plaintiff can proceed under the McDonnell Douglas burden-shifting framework to prove a retaliatory discharge claim. The plaintiff must initially show, by a preponderance of the evidence, that (1) she engaged in a protected activity, (2) her employer took a materially adverse action against her, and (3) the employer did so because of the protected activity. See EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005). The plaintiff must establish that "her protected activity was a but-for cause of the alleged adverse action by the employer," and not merely a "motivating factor." Univ. of Tx. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

As noted above, if the plaintiff establishes a prima facie case, the burden shifts to the defendant, who must articulate a legitimate, non-retaliatory reason for the adverse employment action. See Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). The plaintiff must then "show that the [employer's] reason is mere pretext for retaliation by proving both that the reason was false and that discrimination was the real reason for the challenged conduct." Holland v.

Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (internal citation and quotation marks omitted).

Reed has successfully established a prima facie case of retaliation in this case. Reed formally reported Mitchell's sexual harassment on April 9, 2012. Warden Jarvis terminated Reed on May 18, 2012, just over a month after he learned of her harassment allegations. Although temporal proximity between the protected activity and the allegedly retaliatory discharge "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). The fact that Reed's termination came on the heels of her harassment claim thus satisfies her initial prima facie burden here. However, VDOC has also satisfied its burden to offer a legitimate, non-retaliatory reason for Reed's termination. As discussed above, VDOC maintains that Reed's failure to remain alert on post in violation of her written job description is a legitimate reason justifying her discharge, particularly when considered in tandem with her prior disciplinary record.

Thus, the burden once again shifts to Reed to offer evidence of pretext. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000). In addition to the temporal proximity between Reed's sexual harassment complaint and her termination, Reed has offered evidence showing that a correctional officer should not be disciplined as a result of illness on post and that correctional officers generally were not disciplined for similar conduct. Reed also points to evidence that BCC officials violated internal procedures with respect to her discipline and her harassment investigation. None of

these facts standing alone is sufficient to show pretext; however, the record as a whole, when taken in the light most favorable to Reed, presents a question of fact regarding whether VDOC's justification for Reed's termination was pretext for retaliation. Accordingly, summary judgment will be denied on Reed's retaliation claim.

## Conclusion

For the reasons stated, VDOC's motion for summary judgment will be granted in part and denied in part. Count Two (Quid Pro Quo Discrimination) and Count Three (Hostile Work Environment) will be dismissed, and the case will proceed to trial on Count One (Sex Discrimination) and Count Four (Retaliatory Discharge). As indicated in the court's pre-trial order, issues of liability and damages will be bifurcated. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to the plaintiff and all counsel of record.

ENTER: This 16th day of September, 2014.

_/s/ Glen Conrad_
Chief United States District Judge